IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

JOSEPH D. MORRISSEY,

     Plaintiff,

        v.                         Civil Action No. 3:19-cv-00747

WTVR, LLC d/b/a CBS 6, *et al*,

     Defendants.

## BRIEF IN SUPPORT OF MOTION TO DISMISS

NOW COMES WTVR, LLC d/b/a CBS 6 ("Defendant"), by counsel, and for its Brief in

Support of Motion to Dismiss, states as follows:

### Preliminary Statement

In Webb v. Virginian-Pilot Media Cos., 287 Va. 84 (2014), the Virginia Supreme Court

recognized the chilling effect of defamation claims and emphasized the "essential gatekeeping

function" of trial courts to ensure "that defamation suits proceed only upon statements which

actually may defame a plaintiff, rather than those which merely may inflame a jury to an award

of damages." Id. at 90. The court reaffirmed this important "gatekeeping function" a year later

in Schaecher v. Bouffault, 290 Va. 83 (2015), holding that a trial court must decide "as a

threshold matter of law whether a statement is reasonably capable of defamatory meaning before

allowing the matter to be presented to a finder of fact." Id. at 94. Just this year, the court

reversed a defamation verdict in a strongly-worded opinion where the trial court had abdicated

this duty and failed to grant judgment to the defendant where the statements at issue were clearly

opinions and not statements of fact. See Sroufe v. Waldron, 829 S.E.2d 262 (2019).

These pronouncements from the highest court in Virginia are consistent with the view

long held by the Fourth Circuit. See, e.g., Anderson v. Stanco Sports Library, Inc., 542 F.2d

638, 641 (4th Cir. 1976) ("[G]ranting of summary judgment is especially appropriate in libel

cases, for prolonging a meritless case through trial could result in further chilling of First

Amendment rights."). Indeed, the Fourth Circuit recently reaffirmed the Webb standard in a

high profile case arising from a documentary film by Katie Couric that, through creative editing,

made it appear that various gun rights advocates could not answer questions about gun policy. In

affirming the lower court's dismissal on a Rule 12(b)(6) motion, the court explained:

> In a last-ditch effort to rescue the complaint, appellants cite news reports covering
> the controversy to suggest that "viewers of Under the Gun actually understood the
> exchange" as negatively portraying the VCDL and its members. Assuming this is
> true, it does not answer the question before us. Regardless of how certain media
> outlets covered the short-lived frenzy surrounding this incident, the Supreme Court
> of Virginia has consistently stressed that it is the province of courts to perform the
> "gatekeeping" role of distinguishing defamatory speech from mere insults.
> Schaecher, 772 S.E.2d at 595; Webb, 752 S.E.2d at 811.

> Courts should not — indeed, cannot — abdicate this role in hopes that a member of
> the press or public will answer the question for them. Instead, Virginia law requires
> courts to exercise independent legal judgment as to whether challenged statements
> are susceptible to the defamatory meaning alleged. See, e.g., Perk, 485 S.E.2d at
> 144 (concluding that challenged statements were not "sufficiently defamatory on
> their face to permit a fact finder to decide whether in fact the statements were
> actually defamatory").

> If any doubt remained on this point, the Supreme Court of Virginia's recent
> decision in Webb v. Virginian-Pilot closes the door. There, the court considered an
> appeal from a jury verdict that rested on testimony from several witnesses
> suggesting that they inferred defamatory meaning from the challenged news article.
> Webb, 752 S.E.2d at 812. Notwithstanding this evidence, the court reversed,
> holding as a matter of law that the article was not reasonably capable of the
> defamatory meaning ascribed. Id. Applying these principles, we conclude that the
> district court properly performed its independent gatekeeping role in this case. And
> on the merits of that question, the district court reached the correct result.

Va. Citizens Def. League v. Couric, 910 F.3d 780, 786-87 (4th Cir. 2018).

The Plaintiff in this case is Joseph D. Morrissey, a well-known public figure and former

(and soon to be) public official. His prior legal troubles have been well-documented, as have his

ups and downs in the legal and political world. This case involves a video "Commentary" that

WTVR aired during one of the Plaintiff's attempted resurrections – a failed bid to be the Mayor of Richmond.  The Plaintiff's mayoral campaign occurred after he pled guilty (in an <u>Alford</u> plea) to contributing to the delinquency of a minor stemming from reported sexual encounters with a then-17-year-old employee, whom the Plaintiff later married.  The Commentary noted the Plaintiff's troubled past, his repeated citations for contempt as a lawyer, his disbarment, his criminal conviction, and the Plaintiff's reporting to the General Assembly as a member of the House of Delegates while on work release.  The Commentary, unsurprisingly, took a dim view of the Plaintiff becoming the Mayor of Richmond.

Speech and debate regarding candidates for public office implicate the most important protections of the First Amendment.  As the Supreme Court of Virginia explained in affirming summary judgment in a defamation action brought a disappointed candidate for City Council:

> When, as in this case, allegedly defamatory statements discuss a candidate's fitness for elective office,
>
> [t]he importance to the state and to society of such discussions is so vast, and the advantages derived are so great, that they more than counterbalance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great.
>
> <u>Coleman v. MacLennan</u>, 98 P. 281, 286 (Kan. 1908). "[T]here can be no doubt that discussion of public issues and debate on the qualifications of candidates for public office are integral to the operation of our system of government and are entitled to the broadest protection the First Amendment can afford."  <u>Mahan v. National Conservative Political Action Comm.</u>, 227 Va. 330, 336, 315 S.E.2d 829, 833 (1984).

<u>Jackson v. Hartig</u>, 274 Va. 219, 231 (2007).

Even in cases that do not involve campaigns for public office, the Fourth Circuit has held that the First Amendment "reaches its apogee," where the challenged speech involves the media reporting about public figures on matters of public concern:

> Although Virginia's common law of libel governs this diversity case, the First

Amendment's press and speech clauses greatly restrict the common law where the defendant is a member of the press, the plaintiff is a public figure, or the subject matter of the supposed libel touches on a matter of public concern... Where, as here, all of these considerations are present, the constitutional protection of the press reaches its apogee.

Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1091-92 (4th Cir. 1993) (citation omitted).

Needless to say, all of these factors have converged in this case. The Plaintiff is a public figure complaining about the strong opinions expressed by a member of the media in the context of a race for the highest elected office in the City of Richmond. The statements about which the Plaintiff complains, while admittedly direct, consist of nothing more than (1) opinions about the Plaintiff's fitness for office, (2) imagined defamatory implications that are not actionable as a matter of law, and/or (3) statements that are plainly true or substantially true. Moreover, he has not and cannot allege actual malice. Even without "the broadest protection the First Amendment can afford," see Jackson, 274 Va. at 231, the Plaintiff's claims fail because he has not alleged an actionable statement sufficient to support a claim for defamation.

## I.     Standard for a Motion to Dismiss

A motion to dismiss "challenges the legal sufficiency of a complaint." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009). The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "The plausibility standard requires a plaintiff to demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.'" Francis, 588 F.3d at 193. Rather, a plaintiff must "articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief, i.e., the plausibility of entitlement to relief." Id. (quoting Iqbal, 129 S. Ct. at 1949).

"[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

- 4 -

will not do." Twombly, 550 U.S. at 555.  The allegations must "raise a right to relief above the speculative level[.]"  Id.  Pleading only the "possibility" of a violation is not enough; a complaint must present the "plausibility of 'entitle[ment] to relief.'"  Id. at 557.  While a court presumes all "factual allegations in the complaint to be true and accords all reasonable inferences to the non-moving party,"  the Court is not bound to accept as true "conclusory allegations regarding the legal effect of the facts alleged." Westmoreland v. Brown, 883 F. Supp. 67, 70 (E.D. Va. 1995) (quoting Labram v. Havel, 43 F.3d 918, 921 (4th Cir. 1995)).  Indeed, the "presence… of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support a finding of [liability]." Young v. City of Mount Ranier, 238 F.3d 567, 577 (4th Cir. 2001).

In deciding a Rule 12(b)(6) motion, the Court may consider not only the facts stated in the complaint, but also any incorporated documents and any documents integral to the complaint and relied upon by a plaintiff in bringing the action.  See Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999).  Similarly, when a plaintiff fails to introduce a pertinent document as part of his complaint, the defendant may attach the document to a motion to dismiss, and the Court may consider the same without converting the motion to one for summary judgment.  Gasner v. Cty of Dinwiddie, 162 F.R.D. 280, 282 (E.D. Va. 1995); Tessler v. NBC Universal, Inc., Civ. A. No. 2:08cv234, 2009 WL 866834, at *3-4 (E.D. Va. Mar. 31, 2009) (Jackson, J.), aff'd Tessler v. NBC, Inc., 364 F. App'x 5 (4th Cir. 2010).

## II.     Factual Background as Alleged in the Complaint and as Evidenced by the Broadcast

The Complaint alleges that the Plaintiff "is a well-known criminal defense attorney," a loving husband and father, the former Richmond Commonwealth's Attorney, a former member of the Virginia House of Delegates, and former candidate for Mayor of the City of Richmond, Virginia.  (Compl. ¶ 1).  The Plaintiff claims that "[o]n or about September 2, 2016, WTVR aired

an 'interview' with Joe that WTVR titled, 'Richmond's Mayor Morrissey?'" Id. ¶ 9.

Although the Plaintiff describes the broadcast as an "interview" (and repeatedly puts the term in quotes), both the attached transcript and the actual video make clear that the broadcast was actually a "Commentary" prepared by Mark Holmberg to express his opinion concerning the Plaintiff's candidacy.[1]  For example, the anchor lead-in expressly refers to the piece as "Mark's report and commentary." (Compl., Ex. A at 2, Comm.).  The first shot in the video plainly shows that it is "Mark's Commentary." See **Exhibit 1**.  At the conclusion of the Commentary, Mr. Holmberg states, "That's my take.  Love to hear yours on WTVR.com." (Compl., Ex. A at 4, Comm.).  While the video footage includes two short segments from prior interviews, along with footage from many prior stories, the video plainly indicates that it is not a current interview, but rather an opinion and Commentary regarding the Plaintiff's candidacy.

The video begins with Mr. Holmberg talking on the street. (Comm.).  The Commentary then summarizes, with footage from prior stories, incidents from the Plaintiff's past, including:

- The Plaintiff having been "busted for having a sexual relationship with a 17 year old in his office three summers ago," which both the Plaintiff and the girl denied "even though prosecutors had tons of sexting and texting evidence, including Morrissey bragging to a friend that he had had sex with her on the conference room table and the floor."  The video then shows a text that said, "Hey buddy..just ____ her on my conference table at law office.  Then once again on the floor for good measure!" and a video of the Plaintiff quoting another text that said, "OMG, I just ____ my boss."  The Commentary notes that, "[b]ack then Morrissey told me and everyone else, the texts were fakes ginned up by a jilted lesbian lover." (Compl., Ex. A at 2-3, Comm.).

- The Plaintiff had been in a fist fight with defense attorney David Baugh, and had physically beaten a contractor. (Compl., Ex. A at 3, Comm.).

---

[1] Although the Complaint includes certain still shots from the video, the Plaintiff did not attach a copy of the video to the Complaint.  Instead, the Plaintiff attached a transcript of the text of the video as Exhibit A to the Complaint.  Prior to removal, WTVR filed a Motion Craving Oyer to make the actual video a part of the Complaint, which is the required procedure under Virginia law.  A copy of the video has been separately filed in this action.  Under established law, documents and materials attached to or referenced and relied on in a Complaint can be considered in ruling on a Rule 12(b)(6) motion. See Phillips, 190 F.3d at 618.

I-1629338.3

- The Plaintiff had been cited for contempt of court ten times for being unprofessional, inappropriate, and dishonest. Id.

- The Plaintiff had been disbarred and banned from practicing in federal court. Id.

The Plaintiff does not deny these events, but instead re-characterizes the Commentary as an "interview" based on the inclusion of two short clips from an interview of the Plaintiff conducted by Mr. Holmberg in 2014. The Plaintiff seems to allege that WTVR and Holmberg "intentionally spliced" the interview to make it look like it had occurred in 2016 and that the Plaintiff was lying about not being the father of the son born to his former employee. Both the transcript and video make clear, however, that the interview was from years before. Just prior to the first interview clip, the Commentary referenced the sex scandal from "three summers ago," and said, "***Back then*** Morrissey told me and everyone else, the texts were fakes ginned up by a jilted lesbian lover." (Compl., Ex. A at 2-3, Comm.) (emphasis added). The second video clip from the interview specifically indicated that it was a "2014 Interview." See **Exhibit 2**.

Nevertheless, the Complaint alleges that the "sole, Machiavellian purposes of the on-air 'interview' were to impute to Joe unfitness and inability to serve as the Mayor of Richmond, Virginia, and to scuttle or otherwise destroy Joe's mayoral campaign." (Compl. ¶ 10). Plaintiff claims that the "interview" falsely depicted the Plaintiff as "a stupid liar, who was a sex crazed maniac." He also specifically claims that he was defamed by being called a "fool," "stupid," a "clown," a "nonstop, one ring circus," and a "liar." Id. ¶¶ 12, 15-16. Finally, he also complains that the "interview" charged the Plaintiff with lying and that he had "lied to the investigators and everybody else in this case. That's why the State Bar is coming after him, again." Id. ¶ 13. Plaintiff claims that these statements were "an overt attempt to discredit and destroy [the Plaintiff's] reputation for honesty and integrity." Id.

### III.    The Plaintiff Fails to State a Cause of Action Against WTVR for Defamation

#### A.    Most of the Allegedly Defamatory Statements Are Plainly Opinion

##### 1.    *Statements Amounting to Opinion or Hyperbole Are Not Actionable*

Statements of pure opinion are not actionable.  As the Supreme Court of Virginia

explained in Chaves v. Johnson, 230 Va. 112 (1985):

> Pure expressions of opinion, not amounting to "fighting words," cannot form the
> basis of an action for defamation.  The *First Amendment to the Federal
> Constitution* and *article 1, section 12 of the Constitution of Virginia* protect the
> right of the people to teach, preach, write, or speak any such opinion, however
> ill-founded, without inhibition by actions for libel and slander.  "[E]rror of
> opinion may be tolerated where reason is left free to combat it."  Thomas
> Jefferson's First Inaugural Address (1801).  "However pernicious an opinion may
> seem, we depend for its correction not on the conscience of judges and juries but
> on the competition of other ideas."  Gertz v. Robert Welch, Inc., 418 U.S. 323,
> 339-40 (1974).

Id. at 119; see also Schaecher v. Bouffault, 290 Va. 83, 102-03 (2015).

In order to support a claim for defamation, a statement must be capable of being proved

true or false.  Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1093 (4th Cir. 1993)) (citing

Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990)).  "Thus, speech which does not contain

a provably false factual connotation, or statements which cannot reasonably be interpreted as

stating actual facts about a person cannot form the basis of a common law defamation action."

Schaecher, 290 Va. at 102 (quoting Yeagle v. Collegiate Times, 255 Va. 293, 295 (1998));

Jordan, 269 Va. at 576.  In applying this standard, the Supreme Court of Virginia has expressly

held that statements "that are relative in nature and depend largely upon the speaker's viewpoint

are expressions of opinion."  Id.; see also Chaves, 230 Va. at 118-19 (dismissing a defamation

claim based on a statement that was "in its nature relative, depending for its import largely upon

the speaker's viewpoint").

Similarly, hyperbolic statements are not actionable, particularly when they relate to

public officials or matters of public concern.  The Supreme Court of the United States

- 8 -

I-1629338.3

emphasized the importance of robust public debate on matters of public concern in Greenbelt

Cooperative Publishing Ass'n, Inc. v. Bresler, 398 U.S. 6 (1970), where a local newspaper had

published articles characterizing a real estate developer's negotiating position as "blackmail."

The Court held that a reader would recognize the word "was no more than rhetorical hyperbole, a

vigorous epithet used by those who considered [the developer's] negotiating position extremely

unreasonable." Id. at 14. In reaching this conclusion, the Court emphasized the importance of

having open discussion on matters relating to government and the individuals who run it:

> "The maintenance of the opportunity for free political discussion to the end that
> government may be responsive to the will of the people and that changes may be
> obtained by lawful means . . . is a fundamental principle of our constitutional
> system." Stromberg v. California, supra, 283 U.S. at 369, 51 S.Ct. at 536.
> "Freedom of discussion, if it would fulfill its historic function in this nation, must
> embrace all issues about which information is needed or appropriate to enable the
> members of society to cope with the exigencies of their period." Thornhill v.
> Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093. Because the threat
> or actual imposition of pecuniary liability for alleged defamation may impair the
> unfettered exercise of these First Amendment freedoms, the Constitution imposes
> stringent limitations upon the permissible scope of such liability.

Id. at 11-12; see also Milkovich, 497 U.S. at 20 (explaining the Greenbelt decision as necessary

because it "provides assurance that public debate will not suffer for lack of imaginative

expression . . . which has traditionally added much to the discourse of our Nation.").

While the Plaintiff complains that the sole purpose of the Commentary was to question

the Plaintiff's fitness for office (Compl. ¶ 10), courts applying Virginia law and courts

throughout the country[2] routinely dismiss defamation actions based on statements about a

---

[2] See, e.g., Doe v. Cahill, 884 A.2d 451 (Del. 2005) (blogger's post stating that a councilman
had "character flaws," an "obvious mental deterioration" and was "paranoid" was opinion);
Brown v. Tucker, 954 S.W.2d 262, 265-66 (Ark. 1997) (referring to a state police investigator as
"incompetent and unable to function in his position" was opinion); Verich v. Vindicator Printing
Co., 786 N.E.2d 945 (Ohio Ct. App. 2003) (newspaper editorial claiming that an appointed but
rejected incumbent for state representative had "zero credentials" was non-actionable opinion);
Associated Press v. Cook, 17 S.W.3d 447, 454 (Tex. Ct. App. 2000) (calling a Texas Ranger
captain a "blight on law enforcement" was a protected opinion); Demby v. English, 667 So. 2d

person's qualifications for a position or criticisms about how a person has performed.  See, e.g.,

Gibson v. Boy Scouts of Am., 163 F. App'x 206 (4th Cir. 2006) (calling a person "unfit,"

without any "discernible criteria" by which to measure fitness, was not actionable); Ghawanmeh

v. Islamic Saudi Acad., 857 F. Supp. 2d 22, 44 (D.D.C. 2012) (in a case applying Virginia law,

finding that statements that plaintiff "was not a good teacher," and that "she did not like

teaching" were opinion); Cummings v. Addison, 84 Va. Cir. 334 (Norfolk 2012) (finding that an

e-mail to the plaintiff's employer (a country club) that his family "did not join the club for [the

plaintiff] employee to become a predator, stalk, and harass them or for an environment that

would encourage this kind of behavior" was non-actionable opinion).

### 2.  The Context of the Remarks as part of a Video "Commentary" Makes Clear that They Were Opinions

In analyzing whether allegedly defamatory material contains a statement of fact or

merely an opinion, a trial court must examine the entirety of the published material and cannot

isolate specific words or phrases.  See Am. Commc'ns Network, Inc. v. Williams, 264 Va. 336,

341-42 (2002).  The Supreme Court of Virginia likewise has held that "context is of the utmost

importance" in "all evaluations of defamatory statements."  Schaecher v. Bouffault, 290 Va. 83,

---

350, 355 (Fla. Dist. Ct. App. 1995) (referring to the county animal control officer as "Cruella DeVille" and her policy as "asinine and inhumane" was non-actionable opinion); Dow v. New Haven Indep., Inc., 549 A.2d 683, 687-89 (Conn. Super. Ct. 1987) (finding an editorial to be opinion even though it depicted a school superintendent as having "backwards views" on children with AIDS, "looking more like an ignorant and spineless politician than an educational leader," and attempting to "thwart" the Freedom of Information Act – "an almost laughable challenge to open government" for which he "should go back to elementary school and take a civics class"); Manno v. Hembrooke, 501 N.Y.S.2d 933, 935 (App. Div. 1986) (statements that a school board member engaged in an "immature and childish act" and "spoke more nonsense than he usually does" were opinion); Botos v. L.A. Cty. Bar Ass'n, 199 Cal. Rptr. 236, 239-40 (Ct. App. 1984) (stating that a candidate for a judgeship was "not qualified" under a bar judicial rating system was opinion); Fleming v. Benzaquin, 454 N.E.2d 95, 100, 101 (Mass. 1983) (defendant's statements referring to a police officer as a "little monkey," "tough guy," "absolute barbarian," "lunkhead," "meathead," "nut," and as one of the "dictators and Nazis," and characterizing the officer's conduct as "servile," "unconscionable," "reprehensible," "merciless," and an "absolute outrage" were statements of opinion).

101 (2015); see also Schnare v. Ziessow, 104 F. App'x 847, 851 (4th Cir. 2004) ("In determining whether a statement can be reasonably interpreted as stating actual facts about an individual, we look to the circumstances in which the statement is made.").

While labeling a statement an "opinion" will not insulate the speaker from liability, the fact that speech occurs on a forum associated with opinions (much like in a cartoon or satire) strongly suggests that it contains opinions and not statements of fact, even if that location is not dispositive of the issue. As explained in the leading treatise on defamation:

> If a statement appears in a place usually devoted to, or in a manner usually thought of as representing, personal viewpoints, it is also likely to be understood – and deemed by a court – to be nonactionable opinion. A letter to the editor, for example, an editorial or op-ed column or broadcast, a cartoon, a critical parody or satire of a public person, a sports column, criticism on a radio talk show, or a critical review are ordinarily not actionable although this factor alone is by no means determinative.

Robert D. Sack, Sack on Defamation, § 4:3:1, at 4-33 to 4-44 (4th ed. 2015); see also Rodney A. Smolla, Law of Defamation, § 6:70, at 6-138 to 6-139 (2d ed. 2015) ("On the whole, the decisions run strongly in favor of finding statements on the Op-Ed pages, or in letters to the editor, or in political cartoons protected opinions."). When reading editorials on the opinion page, "[r]easonable readers expect to read columnists' views and opinions as opposed to factual news stories…" Thompson v. Valley Patriot, Inc., 922 N.E.2d 864 (unpublished table decision), 76 Mass. App. Ct. 1119 Mar. 16, 2010) (citing King v. Globe Newspaper Co., 512 N.E.2d 241 (Mass. 1987)) (quoting Aldoupolis v. Globe Newspaper Co., 500 N.E.2d 794, 797 (Mass. 1986)); Loeb v. Globe Newspaper Co., 489 F. Supp. 481, 483 (D. Mass. 1980); Dow v. New Haven Indep., Inc., 549 A.2d 683, 688-89 (Conn. Super. Ct. 1987); National Rifle Ass'n v. Dayton Newspapers, Inc., 555 F. Supp. 1299, 1309 (S.D. Ohio 1983).

3.       *Whether a Statement is Fact or Opinion Is a Question of Law*

Whether an alleged defamatory statement is an actionable fact or non-actionable opinion

is a matter of law for the court to decide.  See Schaecher, 290 Va. at 103; Jordan v. Kollman, 269

Va. 569, 576 (2005); Yeagle v. Collegiate Times, 255 Va. 293, 296-97 (1998).

B.    Application to the Plaintiff's Complaints

In light of the principles outlined above, there is no doubt that the statements about which

the Plaintiff complains are plainly opinions and/or rhetorical hyperbole.  For example, the

Plaintiff complains about being called a "fool," and offers an on-line dictionary definition that

describes a fool as, among other things, "someone who is lacking in judgment or prudence."

Obviously, reasonable people can have differing viewpoints about whether someone lacks

judgment or prudence.  While the Plaintiff may believe that fistfights, contempt citations,

criminal convictions and being disbarred are signs of good judgment or prudence, many people

would disagree.

The Plaintiff similarly complains about being called a "clown" and a "one-ring circus"

and having his conduct described as being "stupid."  Again, no matter how vehemently the

Plaintiff denies being a clown or acting stupidly, both comments depend on the "relative

viewpoint" of the speaker, and neither is capable of being proved true or false.  A person need

only peruse People magazine (or, sadly, a newspaper – e.g., Bill Clinton, Martha Stewart, Bill

Cosby, etc.) to find an endless and ever-growing list of smart, capable, and successful people

who have acted stupidly, or like fools or clowns.  Not surprisingly, courts have consistently

rejected defamation claims based on accusations of being called a "fool" or "clown" or being

labeled "stupid."[3]

---

[3] Chau v. Lewis, 771 F.3d 118, 129 (2d Cir. 2014) ("the epithets…'sucker,' 'fool,' 'frontman,'
'industrial waste,' 'pilot[]' of the 'ship of doom,' and 'crooks or morons'—are hyperbole and
therefore not actionable opinion…  While someone may not appreciate being called a fool, it is
an expression of one's view of another, and moreover might not reflect reality: history has shown
many 'fools' to have indeed been visionaries.  Time may prove the insult misguided, but the
insult is not itself a fact—but rather, is one's perception of facts—at the time it is uttered.");

I-1629338.3

The Plaintiff's contention that WTVR accused the Plaintiff of being a racist by saying he "stupidly" posted a "Plantation-style" picture also fails as a matter of law. The Commentary in no way states, suggests, or implies that the Plaintiff is a racist. Moreover, even if the broadcast created that implication, which is denied, it would be an opinion. Unlike claims based on express statements, which can be analyzed based on precise words, claims of defamation by implication are not bound to the written word, but rather can extend to the full extent of the plaintiff's imagination. Accordingly, claims of defamation by implication are not favored:

> If unrestrained . . . the theory of libel by implication would allow a jury to draw whatever inferences it wished from statements of fact. It would thereby permit liability for the perceived tone of a publication, for statements that are in substance opinion or true, or for statements about public persons that do not pass the "actual malice" test because they do not constitute knowing falsity or "reckless disregard for the truth." The inability, in one celebrated case, of different judges considering identical language to agree whether there was, indeed, a libelous implication highlights the problem. In recent years, therefore, courts have imposed limitations on recovery for libel by implication.

Robert D. Sack, Sack on Defamation §2:4.5, at 2-35 (4th ed. 2011).

---

Giduck v. Socnet.com, 2012 Colo. Dist. LEXIS 2252, at \*11-12 (Colo. Dist. Ct. Dec. 3, 2012) ("Defendant Niblett's statement that Plaintiff Giduck is a "piece of shit" or, a "fool," a "fraud," a "poser civilian," and a "clown" are patently Niblett's opinion and are not actionable."); DePuy v. St. John Fisher College, 129 A.D.2d 972, 973 (N.Y. App. Div. 1987) ("reference to plaintiff as a 'clown' amounted to no more than name-calling or a general insult, a type of epithet not to be taken literally and not deemed injurious to reputation"); Scott v. Moon, 2019 WL 332415, at \*3 (W.D. Va. Jan. 24, 2019) ("Moon's allegedly defamatory statements — that Scott is 'the dumbest person, possibly ever,' 'really fucking stupid,' a 'moron,' a 'slut whore,' that she writes like she uses 'crayola magic marker,' and she has 'ha[d] like a dozen husbands by age 30' — are rhetorical hyperbole rather than assertions of fact... All of these statements are loose, hyperbolic, and based in opinion. Thus, though they may be insulting and offensive, they are not actionable as defamation."), aff'd, 773 F. App'x 138 (4th Cir. 2019), petition for cert. docketed, (U.S. Aug. 27, 2019); Allen v. Echostar Commc'ns Corp., 2005 WL 1123753, at \*3 (E.D. Wash. May 11, 2005) ("the phrase 'stupid bitch' is an offensive vulgarism, but which constitutes non-actionable opinion in a libel context."); Newman v. Hansen & Hempel Co., 2002 WL 31455990, at \*8 (N.D. Ill. Nov. 1, 2002) ("Wenserith's statements that Newman was 'incompetent at her job' and 'stupid' are opinions, not statements of fact. These statements are, therefore, not actionable."); Dilworth v. Dudley, 75 F.3d 307, 310 (7th Cir. 1996) (listing "stupid" among the terms that the Seventh Circuit has held to be incapable of being defamatory because it is hyperbole); Grillo v. John Alden Life Ins. Co., 939 F. Supp. 685, 688 (D. Minn. 1996) (supervisor's taunts that employee was "short and stupid" is not a provably false assertion of fact).

In performing its gatekeeping function, a trial court must examine allegedly defamatory statements "in context" in order to "determine whether a statement can be reasonably understood as stating or implying actual facts, whether those statements are verifiable, and whether they are reasonably capable of defamatory meaning...." Schaecher v. Bouffault, 290 Va. 83, 93 (2015). Moreover, a plaintiff cannot rely on a strained interpretation to create defamatory implications that do not flow naturally from the plain meaning of the words:

> [T]he meaning of the alleged defamatory language cannot, by innuendo, be extended beyond its ordinary and common acceptation. The province of the innuendo is to show how the words used are defamatory, and how they relate to the plaintiff, but it cannot introduce new matter, nor extend the meaning of the words used, or make that certain which is in fact uncertain.

Webb, 287 Va. at 89-90 (citation omitted); Schaecher, 290 Va. at 93.

Applying these principles, courts in Virginia regularly dismiss defamation claims where the published words do not convey the allegedly defamatory meaning urged by the plaintiff. See, e.g., Webb, 287 Va. 84 (holding that the trial court should have granted a demurrer where the article did not convey the implication asserted by the plaintiff); Yeagle v. Collegiate Times, 255 Va. 293, 297-98 (1998) ("[C]onsidering the phrase at issue in the context of the entire article...we find nothing which supports an inference that Yeagle performed her job with a lack of integrity or that she directed others to do so."); Perk v. Vector Res. Grp., Ltd., 253 Va. 310, 316 (1997) (affirming a demurrer to a defamation action brought by a collections lawyer who claimed that his former client impliedly accused him of improperly converting or handling money by advising debtors that the plaintiff had not reported certain payments made by those debtors); PBM Prods., LLC v. Mead Johnson Nutrition Co., 678 F. Supp. 2d 390, 402 (E.D. Va. 2009) ("When viewed in the context of a Press Release ... the statement does not literally or impliedly communicate what Mead Johnson alleges"), aff'd, 639 F.3d 111 (4th Cir. 2011); Mann v. Heckler & Koch Def., Inc., 639 F. Supp. 2d 619, 635-36 (E.D. Va. 2009) (finding that a

J-1629338.3

statement about placing an employee on administrative leave pending an investigation could not

be read to imply he was under investigation for defrauding the government without improperly

"pil[ing] one inference upon the other"), aff'd, 630 F.3d 338 (4th Cir. 2010); Andrews v. Va.

Union Univ., Civ. Act. No. 3:07cv447, 2008 WL 2096964, at *13 (E.D. Va. May 15, 2008)

(finding no defamatory implication of unethical conduct arising from an email to the plaintiff in

which her boss included a copy of the code of ethics in reminding her of her duties).

Nothing in the Commentary remotely suggests that the Plaintiff is a racist.  In fact, the

Commentary clearly states that the Plaintiff married his much younger, African-American wife.

The Commentary simply points out that posing for a picture in a setting associated with a

southern plantation in the pre-Civil War era, in which no African-American woman would be

dressed as was depicted, and after having denied a relationship with the woman, was not

something a public figure vying for public office should have done.  To jump to the conclusion

that the Commentary accuses the Plaintiff of being a racist for having done so, however, would

require piling "one inference upon the other," which Virginia law does not permit.

Moreover, while WTVR adamantly denies the Plaintiff's characterization of the

Commentary, the Plaintiff's claim still fails even if the Court accepts that characterization.  As

with the other comments identified in the Complaint, an accusation of racism is an opinion,

because what constitutes or demonstrates racist tendencies depends on the speaker's viewpoint.

See, e.g., McCafferty v. Newsweek Media Grp., Ltd., Civ. A. No. 18-1276, 2019 WL 1078355,

at *5 (E.D. Pa. Mar. 7, 2019) ("To the extent that Gitlin's statement about racism concerned

C.M., Pennsylvania courts have repeatedly held that labeling someone a racist without more,

though undoubtedly uncomplimentary, is non-actionable opinion."), appeal filed (3d Cir.

Mar. 12, 2019); Squitieri v. Piedmont Airlines, Inc., No. 3:17CV441, 2018 WL 934829, at *4

(W.D.N.C. Feb. 16, 2018) ("Statements indicating that Plaintiff is racist are clearly expressions

of opinion that cannot be proven as verifiably true or false. While there appears to be no North Carolina court expressly addressing this issue, many courts[4] in other jurisdictions that have faced the issue of defamation claims based on accusations of bigotry or racism have held the statements to be nonactionable statements of opinion.... Accordingly, any statements that Plaintiff is a racist are statements of opinion and are not actionable for defamation.").

Likewise, the Plaintiff claims that the Commentary depicted him as a "sex crazed maniac." Again, the Commentary in no way states, suggests, or implies that he is a "sex crazed maniac." The Commentary states—truthfully—that he was convicted for contributing to the delinquency of a minor and describes the evidence against him. Moreover, even if the Commentary did imply that he was a "sex crazed maniac," which WTVR denies, it would be non-actionable opinion. See Desai v. Clark, No. C-11-01809, 2011 WL 2259971 at *3 (N.D. Cal. Aug. 2, 2011) (holding that calling plaintiff a "delusional maniac" is non-actionable opinion); De Moya v. Walsh, 441 So. 2d 1120, 1121 (Fla. App. 1983) (holding that calling co-worker a "raving maniac" is non-actionable opinion).

The last set of statements concerns the Plaintiff's claims about accusations of lying to

---

[4] The cases cited by the court were as follows: "Stevens v. Tillman, 855 F.2d 394, 403 (7th Cir. 1988) (holding that neither general statements charging a person with being racist, unfair, unjust, nor references to general discriminatory treatment, without more, constitute provably false assertions of fact); Standing Comm. on Discipline v. Yagman, 55 F.3d 1430, 1440 (9th Cir. 1995) (holding that calling a judge "anti-Semitic" was a non-actionable opinion); Ward v. Zelikovsky, 643 A.2d 972, 980 (N.J. 1994) (accusation that plaintiffs "hated Jews" nonactionable); Covino v. Hagemann, 627 N.Y.S.2d 894, 895 (Sup. Ct. 1995) (dismissing defamation claim based on statement that plaintiff was "racially insensitive," observing "an expression of opinion is not actionable as a defamation, no matter how offensive, vituperative, or unreasonable it may be" and "[a]ccusations of racism and prejudice" have routinely been found to constitute non-actionable expressions of opinion); Williams v. Kanemaru, 309 P.3d 972 (unpublished table decision), 2013 WL 4458887 (Haw. Ct. App. 2013) (accusation of racism based on disclosed facts not actionable for defamation); Lennon v. Cuyahoga Cty. Juvenile Court, No. 86651, 2006 WL 1428920, * 6 (Ohio Ct. App. May 25, 2006) ("[W]e find that appellant's being called a racist was a matter of one employee's opinion and thus is constitutionally protected speech, not subject to a defamation claim.")."

"everybody," being a "liar," lying about being the father of the son born to his former employee, and that the state bar was coming after him.  All of these claims arise from the Plaintiff's mischaracterization of the broadcast as an "interview" that WTVR spliced together.  As noted above, the broadcast could not be more clear that it was a "Commentary" on the Plaintiff, his troubled past, and whether the citizens of Richmond should elect him as their mayor – not an interview.  It contains numerous video clips from prior stories and, where the interview clips are shown, clearly indicates that the interview was conducted "back then," and was a "2014 Interview."  Even on a motion to dismiss on a Rule 12(b)(6) motion, the Court is not required to accept allegations that are plainly contradicted by materials properly incorporated into a complaint.  Space Tech. Dev. Corp. v. Boeing Co., 209 Fed. Appx. 236, 238-39 (4th Cir. 2006) ("[T]he Court need not accept as true conclusions or inferences from the complaint that are contradicted by the attached exhibits.").

The need to consider source material is particularly acute in defamation actions where the law requires an examination of any allegedly defamatory statements in context.  Indeed, it is a cornerstone of defamation law, repeatedly stressed in Virginia law, that a court must consider the context of allegedly defamatory statements to determine whether they are actionable:

> To determine whether a statement can be reasonably understood as stating or implying actual facts, whether those statements are verifiable, and whether they are reasonably capable of defamatory meaning, we must examine them in context:

> Although varying circumstances often make it difficult to determine whether particular language is defamatory, it is a general rule that allegedly defamatory words are to be taken in their plain and natural meaning and to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used.

Schaecher v. Bouffault, 290 Va. 83, 93-94 (2015).

When considered in context, it is clear that none of the statements is actionable.  As an initial matter, the law of Virginia traditionally has held that merely accusing someone of being a

- 17 -

liar is an insult that does not convey a sufficiently defamatory meaning to be actionable. While

often confused with falsity, the concept of "defamatory meaning" relates to the impact of the

statement. To be actionable, a statement must have a sufficient defamatory "sting." In one of

the earliest formulations of "defamatory meaning," the Supreme Court of Virginia expressly held

that "it is not actionable to call a man a ….liar":

> Words spoken that are merely vituperative, or insulting, or imputing only
> disorderly or immoral conduct, or ignoble habits, propensities or inclinations, or
> the want of delicacy, refinement or good breeding, are not regarded by the
> common law as sufficiently substantial to be treated as injuries calling for redress
> in damages. ***Thus it is not actionable to call a man a*** villain, cheat, rascal, ***liar***,
> coward or ruffian; to accuse him of swearing falsely, unless in a judicial
> proceeding; to charge him with a base or fraudulent act, or with having been
> guilty of adultery, seduction, or debauchery; or a woman with vulgarity, obscenity
> or incontinence; where such defamation bears only on the feelings or general
> standing or reputation of the party implicated, and the misconduct imputed has
> not been made punishable by statute.

Moseley v. Moss, 47 Va. (6 Gratt.) 534, 538 (1850) (emphasis added); see also Schaecher, 290

Va. at 91-92 (reaffirming Mosely).

While more recent decisions have recognized the possibility of basing defamation claims

on lying, those decisions emphasize the importance of context and have typically limited

actionable statements to occasions where there is a clear allegation that the Plaintiff committed

perjury or some similarly egregious offense. For example, in Schnare v. Zeissow, 104 F. App'x

847, 851 (4th Cir. 2004), the Fourth Circuit rejected a claim that a strongly-worded attack on an

affidavit signed by the plaintiff implied that the plaintiff had committed perjury. Noting the

need to analyze an allegedly defamatory statement based on "the circumstances in which the

statement is made," the court rejected the claim that the charges were factual:

> Ziessow readily uses labels such as 'lie,' 'fabrication,' and 'falsehood,' but the
> defamatory capability of these terms cannot be determined on a per se basis. See
> Dilworth v. Dudley, 75 F.3d 307, 310 (7th Cir. 1996). Specifically, we consider
> whether the language used is "'loose, figurative, or hyperbolic language,'" as well
> as the "'general tenor of the article.'" Id. at *184* (quoting Milkovich, 497 U.S. at

21).  Whether the statements in Ziessow's article are actionable thus depends on whether a reasonable reader would construe them as seriously asserting that Schnare committed the crime of perjury.  <u>Milkovich</u>, 497 U.S. at 21, 110 S.Ct. 2695.  Reading the statements from Schnare's complaint in context, we conclude that each one is properly understood as either opinion or hyperbole.

<u>Id.</u>

Where accusations of "lying" or being a "liar" are not associated with claims of perjury or are used with "loose, figurative, or hyperbolic language," courts consider them to be non-actionable opinion or not defamatory as a matter of law.  <u>See, e.g.</u>, <u>Arthur v. Offit</u>, Civ. A. No. 01:109-cv-1398, 2010 WL 883745, at *5 (E.D. Va. Mar. 10, 2010) (finding that the statement "she lies" was an opinion expressed in the context of a debate about a matter of public concern); <u>Baldwon v. Baker</u>, 94 Va. Cir. 366 (Prince Edward County 2016) ("Crawford and Sinyard complain that Baker made defamatory statements to Crossroads staff, namely, Baker made the following comments…'they are liars'…  Each of Baker's statements is insulting or offensive, but these statements are her opinion that is not provably false."); <u>Owens v. DRS Auto. Fantomworks, Inc.</u>, 87 Va. Cir. 30 (Norfolk 2013) ("Finally, calling the Defendant a 'liar' displays Plaintiffs' viewpoint of the situation and can certainly be considered mere puffing of what took place.").

The statements about which the Plaintiff complains were made by a member of the media, commenting on a public figure in the context of race for mayor.  Certainly, any candidate for public office can be expected to endure claims that he lied or is a liar without elevating that omnipresent accusation from a mere insult into an actionable, defamatory statement.  That conclusion is even more certain given the Supreme Court of Virginia's view that "debate on the qualifications of candidates for public office are integral to the operation of our system of government and [is] entitled to the broadest protection the First Amendment can afford." <u>Jackson v. Hartig</u>, 274 Va. 219, 231 (2007).

Moreover, to the extent any of the statements could even conceivably be considered

actionable statements of fact, which is denied, they are true or substantially true.  See AIDS

Counseling & Testing Ctrs. v. Group W Television, 903 F.2d 1000, 1004 (4th Cir. 1990) ("These

statements were true and true statements, no matter how damaging to the plaintiff, may never

provide the foundation for a defamation claim.").  The context of the statements about the

Plaintiff lying and the ensuing investigation plainly concern the Plaintiff's denial of having a

sexual relationship with the woman who is now is wife and the mother of his youngest children.

The Plaintiff does not dispute that he initially denied having that relationship.  Instead, the

Plaintiff tries to re-characterize the Commentary as claiming a specific lie about being the father.

The Commentary makes clear, however, that, at the time of the interview, the Plaintiff had not

admitted his paternity.  In the clip, the Plaintiff specifically says "[d]o you think for a moment *if*

that child is mine, I *would run* from that?  Not - - not *going to* happen."  (Compl., Ex. A at 3)

(emphasis added).  This answer undoubtedly demonstrates that the Plaintiff was talking about

things that would be determined in the future – i.e., "if" paternity is established, whether he

"would run" from it, and his statement that it is not "going to" happen.  Consistent with his

denials of having a relationship, the Plaintiff clearly was not admitting to being the father.

The Commentary expresses the view that the Plaintiff was lying at the time about the

relationship, had lied generally about the relationship (and, thus, to "everybody"), and that the

state bar was coming after him again.  As to the last point, the Complaint merely alleges that,

"[a]dditionally, at the time of the on air 'interview' there was no evidence that the Virginia State

Bar was 'coming after Morrissey again.'"  (Compl. ¶ 7).  It is undisputed, however, that, at the

time of the Commentary (2016), the state bar was coming after the Plaintiff again, which

ultimately resulted in his second disbarment.  See Morrissey v. Va. State Bar, 829 S.E.2d 738,

___ Va. ___ (2019).  In affirming the disbarment, the Supreme Court of Virginia stated that the

"uncontested facts establish that Morrissey had sexual relations with a minor, Myrna Pride, who

- 20 -

I-1629338.3

was seventeen years old at the time.  Morrissey was fifty-five years old," id. at 741, and that the

"stipulated facts" indicated that the "Alford Plea included an attached exhibit titled 'Text

Timeline' that included explicit and sexually graphic text messages to and from Respondent and

MP and nude photographs of MP requested by [Morrissey]." Id. at 741-42.  Both the bar and the

Supreme Court of Virginia rejected the Plaintiff's explanations and arguments and expressly

found that the Plaintiff was not being honest:

> Here, the record indicates that Morrissey encouraged an underage girl to apply to
> his firm, knowing she was below the age of legal consent, and hired her as a
> receptionist.  In short order, he engaged in a sexual relationship with her that
> began in the law office conference room.  Despite his guilty plea, he tries to shift
> the blame to others.  The facts in the record justify a finding by clear and
> convincing evidence that Morrissey's violation of a criminal statute and the
> attendant circumstances call into question his honesty, trustworthiness, and fitness
> to practice law.

Id. at 746.  Additionally, prior to the Commentary, the Plaintiff had been indicted on related

claims that he had forged a court order to avoid criminal liability, but those charges were

dismissed because his plea agreement granted him immunity.  See Commonwealth v. Morrissey,

Rec. No. 0559-15-2, 2015 WL 5554227 (Va. Ct. App. Sept. 22, 2015).[5]

## IV.   Plaintiff Has Not Alleged Facts that Establish That WTVR Made any Statements with Actual Malice

In addition to failing to allege an actionable statement of fact, the Complaint also fails to

allege clear and convincing facts that WTVR acted with actual malice, i.e., that WTVR knew

---

[5]  The Court may take judicial notice of these decisions without converting the Motion to a
motion for summary judgment.  See Papasan v. Allain, 478 U.S. 265, 268 n.1 (1986) ("Although
this case comes to us on a motion to dismiss under Federal Rule of Civil Procedure 12(b), we are
not precluded in our review of the complaint from taking notice of items in the public record.");
Brown v. Ocwen Loan Servicing, LLC, No. PJM 14–3454, 2015 WL 5008763 at *1 n.3 (D.M.D.
Aug. 20, 2015), aff'd 639 Fed. Appx. 200 (4th Cir. 2016) ("A court may take judicial notice of
docket entries, pleadings and papers in other cases without converting a motion to dismiss into a
motion for summary judgment.").

that any statement was false or actually had a high degree of awareness of probable falsity.[6]

Realizing the extraordinarily high burden imposed by the actual malice standard, the Plaintiff includes a laundry list of "factors" that he claims amounts to actual malice. This list, however, consists of nothing more than mischaracterizations (e.g., "intentional splicing," manufacturing false statements (nowhere alleged in the Complaint), and a desire "to paint Joe as a racist") and conclusory allegations about ill-will, a failure to investigate or follow journalistic norms, a failure to provide supporting evidence, and using "unnecessarily strong" language. None of these relates to much less alleges facts to support that WTVR aired the Commentary knowing it was false or with a high degree of awareness that it was probably false. Absent facts of a plausible case that WTVR subjectively knew that the Commentary was false or subjectively had a high degree of awareness of probable falsity, the Plaintiff's claims fail as a matter of law. See Mayfield v. NASCAR, Inc., 674 F.3d 369, 377-78 (4th Cir. 2012) (affirming dismissal of defamation claims where the "allegations simply do not suggest that Appellees knew their statements were false or that they were reckless with respect to their veracity").

A.      Overview of the Actual Malice Standard

The United States Supreme Court first recognized the distinction between public and private plaintiffs, and the differing standards of proof that apply to each, in the landmark decision New York Times v. Sullivan, 376 U.S. 254 (1964). Explaining the need for open and robust debate and discussion of public issues, the Court stated:

> "Those who won our independence believed . . . that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and

---

[6] As a candidate for public office, the Plaintiff was, at a minimum, a public figure subject to the actual malice standard. Jackson v. Hartig, 274. Va. 219, 228 (2007).

imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones.  Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law — the argument of force in its worst form.  Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed."

Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.

Id. at 270.

Although sometimes mistakenly confused with common law malice, actual malice "has nothing to do with bad motive or ill will."  Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 666 n.7 (1989); Reuber v. Food Chem. News, Inc., 925 F.2d 703, 715 (4th Cir. 1991) ("Even if Cooper harbored ill will towards Reuber, and there is no evidence of that, the Supreme Court consistently has held that 'the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term.'"); Jackson v. Hartig, 274 Va. 219, 231 (2007).  Recklessness in a defamation case does not include gross negligence or other objective measures of conduct.  Proof of negligence (e.g., failure to exercise care), spite/ill-will, or recklessness in the ordinary sense of gross negligence does not establish constitutional actual malice as a matter of law.  A person can make a statement without any investigation and nevertheless believe that what he or she is saying is true.  Constitutional malice is a purely subjective measure of what the defendant actually thought.  See Reuber, 925 F.2d at 714.  In simple terms, establishing actual malice requires clear and convincing proof that the defendant was "deliberately lying" or was engaged in conduct approaching "the level of publishing a knowing, calculated falsehood."  Ryan v. Brooks, 634 F.2d 726, 733 (4th Cir. 1980).

The United States Supreme Court explained this crucial distinction in reversing a

defamation verdict in <u>St. Amant v. Thompson</u>, 390 U.S. 727, 731 (1968), where the defendant

had relied on a single source, whose reputation was unknown, without verifying the information:

> [R]eckless conduct is not measured by whether a reasonably prudent man would
> have published, or would have investigated before publishing. There must be
> sufficient evidence to permit the conclusion that the defendant in fact entertained
> serious doubts as to the truth of his publication. Publishing with such doubts
> shows reckless disregard for truth or falsity and demonstrates actual malice.

<u>Id.</u> at 731-32; <u>see also</u> <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 332 (1974) ("[M]ere proof of

failure to investigate, without more, cannot establish reckless disregard for the truth.").

In <u>Richmond Newspapers, Inc. v. Lipscomb</u>, 234 Va. 277 (1987), the Supreme Court of

Virginia explained at length the subjective nature of actual malice in concluding as a matter of

law that a reporter had not acted with actual malice despite allegations and proof that: (1) the

reporter's sources harbored bias or ill-will toward the plaintiff; (2) the reporter predetermined the

facts of the story; (3) the reporter omitted information favorable to the plaintiff; (4) the reporter

had no deadline pressure; (5) the newspaper editors sought confirmation of the facts of the story;

and (6) the reporter told the plaintiff and the school board that he was going to publish the article

whether they provided their comments or not (which the plaintiff took as a threat). <u>Id.</u> at 289-95.

Differentiating common law malice from constitutional actual malice, the court held that "proof

of ill will or bias on the part of an informant is not sufficient in itself to impute knowledge of

probable falsity of the information." <u>Id.</u> at 290. The court further held that "even with the bias

shown, no one of the six elements charged is legally sufficient to justify a jury's finding of a

reckless disregard for the truth" and further held that "[w]e equally are convinced that a

consideration of all these elements as a group demonstrates the same inadequacy." <u>Id.</u> at 295.

The court reached a similar conclusion in <u>Jackson v. Hartig</u>, 274 Va. 219 (2007). The

plaintiff in <u>Jackson</u> had lost an election to City Council and alleged that, prior to the election, a

newspaper had printed a false editorial that asserted that the plaintiff had resigned from the

school board amid a budget scandal. It was uncontroverted that, rather than resign, the plaintiff

faced criminal charges and prevailed after a jury trial. The plaintiff also alleged that the editor

commented that the plaintiff would have to "pay" for his role in allowing the school board to run

deficits while he was a member. Id. at 231. The Plaintiff also submitted evidence that any

investigation would have revealed falsity since the same newspaper had previously published

stories that directly contradicted the editorial. Id. at 229. Despite this evidence, the Supreme

Court of Virginia affirmed the summary judgment:

> Furthermore, a media defendant in a defamation claim subject to the New York
> Times standard cannot be said to have acted with actual malice on account of its
> failure to investigate the accuracy of an allegedly defamatory statement before
> publishing it unless the defendant first "had a high degree of awareness of [its]
> probable falsity." Shenandoah Publ'g House, Inc. v. Gunter, 245 Va. 320, 324,
> 427 S.E.2d 370, 372 (1993); see also St. Amant v. Thompson, 390 U.S. 727, 731
> (1968) ("[R]eckless conduct is not measured by whether a reasonably prudent
> man would have published, or would have investigated before publishing. There
> must be sufficient evidence to permit the conclusion that the defendant in fact
> entertained serious doubts as to the truth of his publication."). Thus, in the
> context of the actual malice inquiry, a duty to investigate the accuracy of one's
> statements does not arise until the publisher of those statements has a high degree
> of subjective awareness of their probable falsity. See Harte-Hanks Commc'ns,
> Inc. v. Connaughton, 491 U.S. 657, 688 (1989) (citing Garrison v. Louisiana, 379
> U.S. 64, 74 (1964)).

Id. at 229-30. Considering the totality of the evidence, the court found no "fact that would

permit a reasonable fact finder to conclude that the defendants published... with actual

knowledge of falsity or subjective serious doubts as to truth. . . ." Id. at 232; see also Jordan v.

Kollman, 269 Va. 569, 580-81 (2005) (reversing a defamation verdict where there was

insufficient evidence that false advertisements had been fabricated by the plaintiff or were the

"product of his imagination"); Shenandoah Publ'g House, Inc. v. Gunter, 245 Va. 320 (1993).

Courts in the Fourth Circuit have similarly rejected the argument that a failure to

investigate or to confirm a source's statements demonstrates recklessness even when combined

with other objective factors. In Reuber v. Food Chemical News, Inc., 925 F.2d 703 (4th Cir.

1991), for example, the Fourth Circuit reversed a defamation verdict and entered judgment for the defendant based on the lack of actual malice.  In Reuber, a publication focusing on the chemical industry reported on an internal reprimand letter that criticized a scientist.  Despite the fact that the source for the letter had an interest in making the scientist look bad, the publication had a profit motive, and the reporter ***consciously decided not to inquire about the accuracy of the claims*** in the letter, the Fourth Circuit held that the plaintiff had failed to prove actual malice by clear and convincing evidence.  Id. at 716; see also Hatfill v. N.Y. Times Co., 532 F.3d 312 (4th Cir. 2008) ("[c]onstitutional malice requires 'much more than a failure to exercise ordinary care' — it demands evidence of the 'publication of a *completely* fabricated story, or of one based entirely on an unverified anonymous telephone call; or publication where there are obvious reasons to doubt the veracity of the informant.'") (emphasis in original); Carr v. Forbes, Inc., 259 F.3d 273 (4th Cir. 2001); Church of Scientology Int'l v. Daniels, 992 F.2d 1329 (4th Cir. 1993); Ryan v. Brooks, 634 F.2d 726 (4th Cir. 1980).

B.      The Plaintiff's Complaint Does Not Allege Facts Which Establish Actual Malice

The actual malice "factors" recited in the Complaint (Compl. ¶ 22) do not address the critical question of whether WTVR acted with knowledge of falsity or with a high degree of awareness of probable falsity.  The Fourth Circuit has made clear, however, that conclusory allegations of actual malice, even those that include circumstantial evidence of ill-will, lack of investigation, and intent to harm, are not sufficient to state a claim for defamation:

> Applying the Iqbal standard to this case, we find that the Appellants have not stated a claim.  To begin with, Appellants' assertion that Appellees' statements "were known by [them] to be false at the time they were made, were malicious or were made with reckless disregard as to their veracity" is entirely insufficient.  This kind of conclusory allegation — a mere recitation of the legal standard — is precisely the sort of allegations that Twombly and Iqbal rejected.  The Appellants go on to point to their allegations that the Appellees intended to harm Mayfield by publishing his drug test results and that Aegis failed to follow SAMHSA testing procedures.  ***But these allegations simply do not suggest that Appellees knew***

*their statements were false or that they were reckless with respect to their veracity.* The Appellants continue by highlighting their allegation that Appellees were informed by Mayfield that he took both Claritin and Adderall, which was legally prescribed. But Appellants admit in their recitation of the facts that before Appellees announced Mayfield's suspension, they contacted Mayfield to follow up on the issue, asking him what drugs he had taken as part of their investigation. *Perhaps most importantly, we must not forget the context in which the allegedly slanderous statements are made*: Mayfield was randomly selected to undergo drug testing pursuant to a valid NASCAR policy and two separate tests yielded a positive result for methamphetamine, a drug that drivers are prohibited from taking. The statements France made at the press conference did no more than report what the positive drug tests indicated — that Mayfield took a recreational or performance-enhancing drug. We therefore affirm the district court's dismissal of the complaint.

Mayfield v. NASCAR, Inc., 674 F.3d 369, 377-78 (4th Cir. 2012) (emphasis added). This conclusion is consistent with the law of Virginia, which similarly does not permit conclusory allegations of actual malice to withstand a motion to dismiss. See Tomlin v. IBM, 84 Va. Cir. 280, 288 (Fairfax County 2012); Koegler v. Green, 78 Va. Cir. 478, 482-85 (Hanover County 2009); Jarrett v. Goldman, 67 Va. Cir. 361, 374-76 (Portsmouth 2005).

More importantly, the Plaintiff cannot allege facts sufficient to show actual malice. It is simply not possible to have acted with knowledge of falsity in accusing the Plaintiff of lying where the Plaintiff does not dispute his repeated citations for contempt (including for dishonesty), his disbarment by the Virginia State Bar, his banishment from this Court, and his conviction for contributing to the delinquency of a minor after having denied having any sexual relationship with the minor. While the other statements about which the Plaintiff complains are clearly opinions, the same analysis would apply to those comments as well.

## V.  The Statements Do Not Support a Claim for Insulting Words

Count II of the Complaint asserts a cause of action under the insulting words statute, claiming that "Defendants' defamatory words are fighting words, which are actionable under § 8.01-45 of the Virginia Code...." Compl. ¶ 27. This claim also fails as a matter of law.

- 27 -

The insulting words statute has been largely assimilated into the law of defamation and requires, at a minimum, sufficient allegations to support a cause of action for defamation. <u>See</u> <u>Shupe v. Rose's Stores, Inc.</u> 213 Va. 374 (1972) (noting that "all actions for libel and insulting words under the statute are to be treated as slander" and dismissing defamation and insulting words claims where the plaintiff failed to prove an actionable case of defamation). The Plaintiff also fails to allege words spoken in a context sufficient "to provoke violence or breach of the peace." The insulting words statute was originally enacted to avoid duels and is sometimes referred to as the "anti-dueling statute." <u>Hutchins v. Cecil</u>, 44 Va. Cir. 380, 382 (Fairfax County 1998). Importantly, while the statute has been largely assimilated into the common law of defamation, Virginia courts have not abandoned the requirement that the plaintiff show that the words used "were such as to provoke violence or breach of the peace." <u>Allen & Rocks, Inc. v.</u> <u>Dowell</u>, 252 Va. 439, 443 (1996). In fact, courts routinely dismiss claims under the insulting words statute absent allegations that the insults were "used in a verbal attack directed at a particular individual in a face-to-face confrontation that presents a clear and present danger of a violent physical reaction." <u>Hutchins</u>, 44 Va. Cir. at 385. <u>See also</u> <u>Thompson v. Town of Front</u> <u>Royal</u>, Civ. A. No. 5:98CV00083, 2000 WL 329237, at *4 (W.D. Va. Mar. 16, 2000) ("Even read in the light most favorable to the plaintiff, from the allegations of the complaint, the words allegedly spoken by [the defendants] cannot be construed as having been directed at a particular individual in a face to face confrontation and as presenting a clear and present danger of a violent physical reaction."); <u>Mak Shun Ming Hotung v. Hotung</u>, 85 Va. Cir. 241 (Fairfax County 2012) ("This court is of the opinion that for Virginia Code § 8.01–45 to be actionable the words must be conveyed face to face or in such manner as to incite an immediate breach of the peace").

Plaintiff's conclusory allegation that the Commentary contained "fighting words" is wholly insufficient to support a claim under the insulting words statute. Conclusory allegations

that words tend to violence and a breach of the peace are not sufficient to state a claim.  See

Hutchins, 44 Va. Cir. at 381 ("The mere statements that the insults were made in public and

tended to violence and a breach of the peace by themselves do not sufficiently state a

compensable claim under Va. Code § 8.01-45.").

WHEREFORE WTVR respectfully requests that the Court grant its Motion to Dismiss

and grant WTVR such other and further relief as the Court deems just and proper.

Dated: October 18, 2019                           Respectfully submitted,


By: _____/s/_____
        Brett A. Spain (VSB #44567)
        Conrad M. Shumadine (VSB #4325)
        Counsel for Defendant,
        WTVR, LLC d/b/a CBS 6
        Willcox & Savage, P.C.
        440 Monticello Avenue, Ste. 2200
        Norfolk, Virginia 23510
        (757) 628-5500 Telephone
        (757) 628-5566 Facsimile
        bspain@wilsav.com
        cshumadine@wilsav.com

## CERTIFICATION

I hereby certify that on this 18th day of October, 2019, I will electronically file the foregoing with the Clerk of the court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

> Steven S. Biss (VSB #32972)
> 300 West Main Street, Ste. 102
> Charlottesville, Virginia 22903
> (804) 501-8272 Telephone
> (202) 318-4098 Facsimile
> stevenbiss@earthlink.net
> *Counsel for Plaintiff*

By: _____/s/_____

> Brett A. Spain (VSB #44567)
> Conrad M. Shumadine (VSB #4325)
> Counsel for Defendants,
> WTVR, LLC d/b/a CBS 6
> Willcox & Savage, P.C.
> 440 Monticello Avenue, Ste. 2200
> Norfolk, Virginia 23510
> (757) 628-5500 Telephone
> (757) 628-5566 Facsimile
> bspain@wilsav.com
> cshumadine@wilsav.com

1-1629338.3